UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| BARBARA CAUDILL on behalf of | ) | |
| ZACHARY CAUDILL (DECEASED), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:12-CV-00771-CAN |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

On November 27, 2012, Barbara Caudill filed a complaint in this Court on behalf of her son, Zachary Caudill ("Zachary"), who died on December 24, 2011, while appeals in this matter were pending.[1] In her complaint, Caudill requests reversal or remand of the decision of the Commissioner denying Supplemental Security Income ("SSI") to Zachary. On March 27, 2013, Caudill filed her opening brief and on July 1, 2013, Defendant Acting Commissioner of Social Security, Carolyn W. Colvin ("Commissioner") responded. Caudill filed a reply brief on July 15, 2013. This Court may enter a ruling in this matter based on the parties' consent, 28 U.S.C. § 636(c), and 42 U.S.C. § 405(g).

**I.  PROCEDURE**

On June 9, 2009, Zachary filed an application for SSI, alleging disability since birth caused by a pervasive developmental disorder, atypical autism, Asperger syndrome, and a heart condition.[2] (Tr. 174). His claims were originally denied on December 1, 2009, and also on

---

[1] Zachary died of sepsis related to pneumonia and a possible pulmonary embolism. Caudill filed her Notice Regarding Substitution of Party Upon Death of Claimant with the Social Security Administration on February 13, 2013. (Tr. 7).

[2] Zachary also filed an application for Disability Insurance Benefits ("DIB") on June 9, 2009. The DIB application was denied on June 20, 2009, and never appealed. Therefore, Zachary's SSI application is the only claim at issue before this court.

reconsideration on March 19, 2010. Zachary appeared before an administrative law judge ("ALJ") on July 18, 2011.

On July 25, 2011, the ALJ issued a decision holding that Zachary was not disabled, as defined in the Social Security Act, from June 9, 2009, the date of his SSI application, through the date of the decision. Zachary requested review by the Appeals Council on September 21, 2011, and the request was denied on October 2, 2012, making the decision of the ALJ the final decision of the Commissioner of Social Security. *See Fast v. Barnhart,* 397 F.3d 468, 470 (7th Cir. 2005); 20 C.F.R. § 404.981.

## II. ANALYSIS

### A. Facts

Zachary was 20 years old when he applied for SSI and 22 years old on the date of the ALJ's decision. At the time of the hearing, he was taking a skill building class in preparation for GED classes. He had briefly worked as a groundskeeper with his father's employer.

In his application for SSI, Zachary alleged that he became disabled at his birth on January 22, 1989. He alleged that he suffered from a pervasive developmental disorder, atypical autism, Asperger syndrome, and a heart condition. His heart condition caused physical stamina impediments, shortness of breath, chest pains, and dizziness.

Due to his developmental and attention deficit disorders, Zachary had trouble with concentration and articulation in school. When he was in the fourth grade, his mother withdrew him and home-schooled him for the remainder of his education. At the time of the proceedings, Zachary complained of restrictions in his ability to maintain attention and concentration for prolonged periods of time. He also alleged that he had difficulties completing a normal workday

due to interruptions from psychologically based symptoms, acting appropriately with the general public, and responding to changes in the work environment as a groundskeeper.

### 1. Claimant's Hearing Testimony

At the ALJ hearing on July 18, 2011, Zachary testified that in school math was difficult for him, and he took special education classes to help with his speech. He reported that he was unable to carry more than seventy-five pounds and that his doctor told him not to carry more than ten pounds. Zachary testified that he had been to the doctor six months before the hearing and was told that his heart condition had not improved.

Zachary further reported that he had difficulty with maintaining focus and with his memory. He also said that he was able to use the computer for social media and games during the day. In addition, Zachary indicated that he had an X-Box 360 game system he used about four hours once or twice a week. He testified that he participated in physical activities with family and friends by playing basketball and touch football, but noted that he would frequently have to stop because of shortness of breath. He reported that he did social activities with family and friends like going to restaurants, the movies, and church.

Zachary further testified that he briefly worked as a groundskeeper, with the company that employed his father. He said that he had difficulty keeping up with the pace of the work because he would get short of breath. He also indicated that he had difficulty understanding his boss's instructions. He also testified that he did chores at home, such as putting away dishes, mowing the lawn, doing laundry, and cleaning his room.

### 2. Barbara Caudill's Testimony

Caudill stated at the ALJ hearing that she did not believe Zachary had exaggerated his testimony about his mental or physical abilities, although she believed that he had underestimated his challenges. She said that Zachary's groundskeeper boss had expressed that Zachary had trouble following instructions and interacting with the other employees. She also said that Zachary had trouble with compromise. Caudill further testified that Zachary was introverted and that he withdrew when conflict arose. She described him, however, as easy to get along with as long as there was no conflict.

Caudill also testified that she would not leave her son at home by himself for extended periods of time because he would forget to do basic chores, like feed the dog. She said that she did not believe that Zachary could live independently in a separate apartment. She also said that she had to remind him daily to take his medicine, and two to three times a week he would still not take it.

Caudill further testified that she did not think that Zachary fully understood his heart doctor's medical diagnosis. She also stated that when Zachary went to the movies or restaurants with friends it was always with a sibling present or with an individual, such as his pastor.

### 3. Psychological Evidence of Dr. Cadwell and Ms. Uceny

On January 12, 2009, Dr. Carrie Cadwell, at the recommendation of Zachary's counselor, Jillorna Uceny, began a psychological evaluation of Zachary. She analyzed reported symptoms, functioning difficulties, background history, family history, behavioral observations, records, and tests results. Dr. Cadwell diagnosed Zachary with a Pervasive Developmental Disorder Not Otherwise Specified, otherwise known as Atypical Autism. (Tr. 253). She concluded that his IQ was low average to below average, but that he was not grossly impaired in general intellectual ability. She concluded, however, that his reading skills were well below average.

Subsequently, Zachary sought further clinical treatment from Uceny, a licensed clinical social worker, on four occasions between June 3, 2010, and March 24, 2011. She reported in her initial meetings with Zachary that he had "a hard time cognitively" and felt "very overwhelmed." (Tr. 301). She reported in his mental impairment questionnaire, dated November 4, 2010, that he had a Global Assessment of Functioning ("GAF")[3] score of 63, but that his highest GAF score in the past year had been 53. (Tr. 213). Uceny also noted his difficulty in thinking and concentrating; social withdrawal or isolation; blunt, flat or inappropriate affect; and generalized persistent anxiety. (*Id.*). She further commented on Zachary's ability to work, noting that he was seriously limited but not precluded in remembering work-like procedures; understanding and remembering very short and simple instructions; maintaining regular attendance; and being punctual with customary, usually strict tolerances. (Tr. 215). She found that Zachary could sustain an ordinary routine without special supervision; work in coordination with or proximately to others without being unduly distracted; complete a normal workday and work week without limitations from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 215–16). She further found that Zachary could ask simple questions or request assistance; get along with co-workers or peers without unduly distracting them or exhibit behavioral extremes; respond appropriately to changes in a routine work setting; deal with normal work stress; and be aware of normal hazards and take appropriate precautions. (*Id.*). However, Uceny also found that Zachary could

---

[3] A Global Assessment of Functioning ("GAF") score is based on a 100-point scale rating an individual's overall psychological, social, and occupational functioning. AM. PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed., text rev. 2000). A score between 51 and 60 suggests moderate symptoms or moderate difficulty in social, occupational, or school functioning (e.g.. few friends, conflicts with peers or co-workers). *Id.* A score between 61 and 70 suggests some mild symptoms or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *Id.*

not maintain attention for two hour segments, make simple work-related decisions, and accept instructions and respond appropriately to criticism from supervisors. (*Id.*). In assessing Zachary's functional limitation due to his mental impairments, Uceny found that he had "marked" restrictions in daily living and social functioning. (Tr. 217). Finally, she indicated that Zachary had "frequent" deficiencies of concentration, persistence, and pace as well as "repeated" episodes of decompensation. (*Id.*).

    4.  **Agency Psychological Evidence**

On August 10, 2009, Dr. Kladder, at the request of the agency, prepared a Mental Residual Functional Capacity Assessment, finding that Zachary was moderately limited in the ability to maintain attention and concentration for extended periods; to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a constant pace without an unreasonable number and length of rest periods; to act appropriately with the general public; and to respond appropriately to changes in the work setting. (Tr. 256–57). He also concluded that Zachary had mild restrictions of activities of daily living; moderate difficulties maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. Dr. Kladder found that Zachary had no episodes of decompensation of extended duration.

    5**.**  **Medical Evidence of Dr. Merchand and Dr. Randazzo**

On October 6, 2008, Zachary met with Dr. Hector Merchand, a cardiologist, at the advice of his family physician, Dr. Paul Russo, to review his echocardiogram. Dr. Merchand concluded that Zachary had at least a moderate and probably severe calcific aortic valve stenosis with moderate aortic valve sufficiency. (Tr. 246). He also determined that Zachary was symptomatic, experiencing shortness of breath, chest pains, and dizziness. These symptoms,

however, were all secondary to Zachary's significant aortic valve disease. Dr. Merchand diagnosed Zachary with left ventricular hypertrophy.[4] *Id.*

In November of 2009, Zachary had another echocardiogram that was read by Dr. Thach Nguyen who found mild left atrial enlargement, mild left ventricular hypertrophy and good systolic function, heavy calcification of the aortic valve, mild to moderate aortic stenosis, moderate aortic regurgitation, trace mitral regurgitation, and heavy calcification in the posterior leaflet with trace mitral regurgitation. On September 30, 2010, Zachary met with Dr. Randazzo who reviewed his echocardiogram. She determined that he had a systolic ejection murmur, normal sinus rhythm, left ventricular hypertrophy or enlarged heart, bicuspid aortic valve, heart racing, and shortness of breath. The last time Zachary visited Dr. Randazzo, she noted he had a bicuspid aortic valve with regurgitation and that he was obese. She also noted that he was stable and asymptomatic as to his heart condition.

6. **Agency Medical Evidence**

Upon receiving Zachary's SSI application, the Social Security Administration recommended that Zachary see Dr. Ralph Inabnit, an osteopathic physician, to evaluate his medical impairments. Dr. Inabnit concluded that Zachary had Grade III Systolic ejection murmur, obesity, possible pervasive developmental disorder, possible atypical autistic disorder, and a possible learning disability. He then recommended that Zachary be seen by a psychiatrist, have a mental status examination, have a chest x-ray, follow up with a cardiologist, and have a review of his previous echocardiogram. Subsequently, Zachary had another echocardiogram that was reviewed by Dr. Nguyen and on another occasion was reviewed by Dr. Randazzo as Dr.

---

[4] Ventricular hypertrophy is an enlargement of the muscles of the heart's main muscles chamber. MAYO CLINIC, http://www.mayoclinic.com/health/left-ventricular-hypertrophy/DS00680.

7

Inabnit recommended. Zachary did not see a psychiatrist after Dr. Inabnit's recommendation, but he continued his therapy with Uceny.

### 7. Decision of the Administrative Law Judge

The ALJ found that Zachary had not engaged in substantial gainful activity since June 9, 2009, the application date. The ALJ identified pervasive development disorder, attention deficit disorder, and aortic valve disease as severe impairments. He also found obesity and hypertriglicerema as non-severe impairments. The ALJ determined that Zachary did not have an impairment meeting or medically equaling an impairment listed in the Social Security regulations. (Tr. 22–23).

The ALJ concluded that Zachary had the residual functional capacity to perform sedentary work. (Tr. 25). He determined that Zachary could lift ten pounds occasionally and less than ten pounds frequently. He also concluded that Zachary could stand and walk six hours of the eight-hour workday, as well as sit for six of the eight hour work day. The ALJ further determined that he could occasionally balance, stoop, kneel, crouch, and crawl. He also stated that Zachary had to refrain from concentrated exposure to extreme temperatures and extreme humidity.

The ALJ determined that Zachary could perform simple, routine tasks and could occasionally interact with co-workers, supervisors, and the general public. Finally, the ALJ stated that Zachary could keep pace to meet quotas and complete tasks typically found in unskilled labor. He adopted the vocational expert's opinion finding that Zachary would be able to perform the work of a production assembler, small parts assembler, and electronics worker, which all had positions available in the local and national economy. Based on these findings, the ALJ concluded that Zachary was not disabled under the Social Security Act. (Tr. 30).

**B.     Standard of Review**

The Social Security Administration follows a five-step sequential process in order to determine if a claimant is disabled.  20 C.F.R. § 416.920(a)(4).  To find disability, the ALJ must determine whether: (1) the claimant is presently employed in substantial gainful activity; (2) the claimant has a severe impairment or combination of impairments that is severe; (3) the claimant's severe impairment meets or equals any severe impairment listed in the regulations; (4) the claimant's residual functional capacity leaves him unable to perform past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.  *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). The ALJ must answer yes to step three or five in order to find disability.  *Id.* at 352. The burden of proof is on the claimant in steps one through four and shifts to the Commissioner at step five. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

The Court will affirm the decision of the ALJ if it is supported by substantial evidence and no legal error exists. 42 U.S.C. § 405(g) (2006). The Court affords *de novo* review to the ALJ's legal conclusions. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2004). "Substantial evidence" is more than a scintilla; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995). The ALJ must have built a logical bridge from the evidence to the conclusion. *Haynes*, 416 F.3d at 626.  A reviewing court must not substitute its own opinion for the ALJ's opinion, and it must not reweigh evidence.  *Id*.  An ALJ's decision must "sufficiently articulate [his] assessment of the evidence to assure [the reviewing court] that the ALJ considered the important evidence…[and to enable the reviewing court] to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 2003).  An ALJ need not provide a "complete

written evaluation of every piece of testimony and evidence." *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004). An ALJ's decision cannot stand, however, if it lacks evidentiary support or an adequate discussion of the issues. *Id.*

## C. Issues for Review

Caudill contends that substantial evidence does not support the ALJ's findings that (1) Zachary's obesity was not a severe impairment; (2) Zachary's autism did not meet or medically equal Listing 12.10 for Autistic Disorder; (3) Zachary could perform sedentary work; and (4) jobs existed in the national economy that Zachary could perform given his residual functional capacity.

### 1. Severity of Zachary's obesity impairment

Caudill first contends that the ALJ erred in the second step of the analysis, when he determined that Zachary's obesity was a non-severe impairment. Caudill argues that substantial evidence shows that his obesity was a severe impairment because all of Zachary's examining doctors mentioned his obesity. Caudill asserts that both Dr. Inabnit and Dr. Randazzo diagnosed Zachary with obesity. She points out that Zachary testified that he experienced chest pains and shortness of breath. Caudill also contends that the ALJ did not provide enough information to show how he determined that obesity was a non-severe impairment.

A severe impairment is found when the ALJ finds that a medically determinable physical or mental impairment significantly limits an individual's ability to do work. 20 C.F.R. § 416.920(c). Alternatively, a non-severe impairment causes minimal functional limitations on an individual. SSR 02-1p. No specific level of weight or Body Mass Index ("BMI") makes an individual's obesity severe on non-severe. *Id*. To evaluate whether obesity is severe, the ALJ is required to make an individualized assessment of the impact of obesity on the claimant. *Id*.

10

However, failure to label an impairment, such as obesity, as severe is not a reversible error when the ALJ finds other severe impairments and the five-step analysis continues. *Brown v. Astrue*, 2009 WL 722299, at *10 (S.D. Ind. March 18, 2009). The second step of the analysis is to eliminate consideration of individuals who only have slight impairments. *Taylor v. Schweiker*, 739 F.2d 1240, 1243 n. 2 (7th Cir. 1984). When a claimant does not mention how obesity would have affected the ALJ's five-step analysis, a court is not required to remand the decision. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

Here, the ALJ stated that no evidence was found to show that the obesity exacerbated the cardiac condition. (Tr. 22). The ALJ also cited that Zachary, himself, never reported that his obesity caused him any limitations. *Id.* The ALJ adopted the opinions of the doctors who concluded that Zachary suffered from an aortic valve disorder, and these doctors factored Zachary's obesity into their overall diagnosis. Whether the ALJ fully articulated his rationale for labeling Zachary's obesity as a non-severe impairment is inconsequential, however. Even if the Court remanded this case for the ALJ to articulate his reasoning further, it would not affect the outcome of this case. Zachary's other severe impairments forced the ALJ to continue the analysis. *See Brown*, 2009 WL 722299, at *10. The regulations governing SSI do not include a specific listing for obesity. SSR 02-1p. An ALJ may find that an individual with obesity meets a listing only if the individual has another severe impairment. *Id.* ALJs must consider, however, all impairments including non-severe impairments when determining a claimant's residual functional capacity ("RFC"). 20 C.F.R. § 416.945(a)(2). As a result, Zachary's obesity would have been incorporated into the disability analysis regardless of whether it was labeled severe or non-severe. Therefore, the Court finds no cause to reverse or remand at step two of the analysis.

    2.    **Listing 12.10 – Autistic Disorder**

11

Caudill claims that substantial evidence does not support the ALJ's determination that Zachary's severe impairments did not equal Listing 12.10. This listing relates to autistic disorder and other pervasive developmental disorders, which are shown by characteristics such as qualitative deficits in the development of reciprocal social interaction, verbal and nonverbal communication skills, and imaginative activity. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.10. In order to meet the listing, the claimant has the burden of showing that he or she has two of the following characteristics:

1. Marked restriction of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence or pace; or
4. Repeated episodes of decompensation, each of extended duration.

*Id*. In making a determination, the ALJ must discuss the listing by name and offer more than a "perfunctory analysis." *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004). The ALJ does not have to mention every piece of evidence, but the ALJ must take into account highly pertinent evidence and make a connection between that evidence and the conclusion. *Rice*, 384 F.3d at 370. The ALJ's decision must elaborate on significant medical history, including the examination and laboratory findings and the functional limitations that were considered. 20 C.F.R. § 416.920(e)(4). An ALJ decision must be "based on medical evidence demonstrated by medically acceptable clinical and laboratory diagnostic techniques." SSR 86-8.

Caudill argues that the ALJ wrongly ignored the opinions of Uceny, Zachary's therapist who opined that Zachary fit all the characteristics of part B in Listing 12.10 in her mental

impairment questionnaire. Caudill also contends that the ALJ failed to use any of the medical history in the record to support his conclusion.

Caudill misstates the ALJ's opinion when he argues that the ALJ did not rely on medical evidence and also ignored Uceny's opinions. At the end of Section 3 of the opinion where the ALJ determined that Zachary did not medically equal a listed impairment, the ALJ stated that his determination of Caudill's RFC "reflects the degree of limitation the undersigned found in the 'paragraph B' mental function analysis." (Tr. 24). In the RFC determination, the ALJ considered Uceny's opinions along with the medical opinions of Dr. Inabnit, Dr. Kladder, and Dr. Cadwell.

The ALJ offered an explanation of why he afforded Uceny little weight in his decision. The ALJ mentioned that Uceny's determination that Caudill had all of the characteristics required in "paragraph B" was inconsistent with her findings that Caudill had a "'fair' ability to complete a normal work day and work week without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable amount of rest periods; and respond appropriately to changes in a routine work setting. (Tr. 27-28). Further, the ALJ mentioned that Uceny found Caudill had the ability "to remember work-like procedures; to understand, remember and carry out very short and simple instructions; to maintain regular attendance; to sustain an ordinary routine without special supervision; and to work in coordination with or in proximity to others without being duly distracted." (Tr. 27).

While the ALJ offered no evidence to support his finding that Zachary had no episodes of prolonged decompensation, the only mention of prolonged decompensation in the record is from Uceny whose opinion lacked medical evidence in support. (Tr. 24). Because there was none, the ALJ could not support his finding with medical evidence. Reversal and remand is only required when the ALJ offers a "superficial" analysis of the listing. *Rice*, 384 F.3d at 270. Here, the

record as cited by the ALJ in his opinion supports his finding that Zachary did not meet Listing 12.10.

### 3. The ALJ's RFC determination is not supported by substantial evidence.

In order to continue with steps four and five in the disability process, the ALJ must make a RFC determination. 20 C.F.R. § 416.920(a)(4). A RFC is an administrative assessment of the maximum an individual can do despite the limitations imposed on his medically determinable impairments. 20 C.F.R. § 416.945(a)(1). In reaching a RFC determination, the ALJ considers all allegations of physical and mental limitations, and bases the assessment on all relevant evidence, such as medical history, reports of daily activities, the effects of treatment, and lay evidence. SSR 96-8p. The ALJ must include a "narrative discussion describing how the evidence supports a conclusion." *Id.*

#### a. The ALJ's findings that Zachary had a GAF score of 63

Caudill argues that the ALJ erred by basing his decision that Zachary was capable of sedentary work on the GAF score of 63 reported in the mental impairment questionnaire completed by Uceny. Caudill contends that Uceny mistakenly wrote 63 on the questionnaire because she had written on the same questionnaire that Zachary's highest GAF score that year was 53. (Tr. 213, 301). She argues that because the ALJ used an incorrect score to determine Zachary's RFC, substantial evidence does not support his findings. Caudill further argues that the ALJ incorrectly interpreted Dr. Inabnit's opinion by stating that Zachary had "normal intelligence." She claims that the ALJ "cherry picked" the words "normal intelligence" from the Dr. Inabnit's exam resulting in a determination inconsistent with the findings of the doctor.

The Commissioner argues that even if the GAF score of 63 was incorrect, it was only one factor in the ALJ's determination. According to the Commissioner, the GAF score was not

determinative to the RFC finding.  The Commissioner also argues that the 53 score could have been the error and not the 63 score.  The Commissioner further contends that the ALJ correctly stated that Caudill had "normal intelligence."  He argues that because Dr. Cadwell's findings support Dr. Inabnit's conclusion that Zachary had "normal intelligence," the ALJ correctly reflected the record in his RFC determination.

When evaluating a RFC determination, it is not the duty of the Court to reweigh evidence or substitute its own opinion for that of the ALJ.  *Haynes*, 416 F.3d at 626.  The ALJ is only required to minimally articulate his reasons for accepting or rejecting evidence.  *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).  The ALJ must provide a "logical bridge" from the evidence to his conclusion.  *Haynes*, 416 F.3d at 626.  Here, the ALJ's decision stated that Zachary's score was 63, which is indicative of someone who has difficulty in social, occupational, or school functioning but functions well with meaningful interpersonal relationships.  (Tr. 27).  The ALJ supported this score with evidence that Zachary had difficulty with thinking or concentrating and that he experienced social withdrawal, blunt affect, and generalized persistent anxiety.  *Id.* The ALJ also cited Uceny's findings that Zachary had the ability to remember work-like procedures, to understand and carry out very short and simple instructions, and to work in coordination with or in proximity to others without being duly distracted.  *Id*.  Based on the evidence that the ALJ cited, the ALJ offered the "logical bridge" needed to support the conclusion.  *See Haynes*, 416 F.3d at 626.

Caudill has failed to offer evidence showing how a score of 63 is inconsistent with the record.  Caudill does not offer evidence or argument that the ALJ impermissibly overlooked evidence that would have clarified the difference in these two scores.  Caudill has only provided evidence that Uceny's opinion in her overall evaluation on November 4, 2010 was consistent

with a GAF score of 53 and not 63. This Court has already found, however, that the ALJ properly provided the logical bridge to determine that Uceny's evaluation was faulty. Because the ALJ has provided the logical bridge necessary to support his reliance on the 63 GAF score, and Caudill has offered no further support outside of Uceny's opinions that the 63 GAF score is inconsistent with the record, substantial evidence supports the ALJ's RFC determination. *See Haynes*, 416 F.3d at 626.

Furthermore, Dr. Inabnit's findings supported the ALJ's statement that Zachary had normal intelligence. Dr. Inabnit noted that Zachary's full scale IQ and general range of intellectual functioning were in the low average and below average range. (Tr. 280). Although his intellectual functioning was low, Dr. Inabnit did not find that Zachary was impaired in intellectual functioning; cross verbal, non-verbal, visual, spacial, working memory; attention skills, and visual motor processing speech. *Id*. Further, Dr. Inabnit found that Zachary was not grossly impaired in his general intellectual ability. In addition, Dr. Cadwell stated that Zachary was "anything but intellectually delayed and that he might struggle more in memory attention skills and visual motor processing but was not impaired in these areas. (Tr. 280). Taking into account both Dr. Inabnit's opinion and Dr. Cadwell's opinion, the ALJ built a logical bridge in his opinion to his conclusion that Zachary had normal intelligence. Therefore, the ALJ's reliance on the GAF score of 63 and the conclusion Zachary had normal intelligence is supported by substantial evidence when determining Zachary's RFC.

          **b.**       **Weight of Dr. Cadwell's opinion**

Caudill also argues that the ALJ incorrectly stated that there was no credible medical evidence to contradict that of the state agency psychologist, Dr. Kladder. Caudill asserts that Dr. Cadwell's finding that Zachary needed to live in a "supported environment" was inconsistent

with Dr. Kladder's finding that Zachary had moderate limitations in social functioning and concentration. Caudill further argues that because Dr. Cadwell was Zachary's treating psychologist, Dr. Cadwell's opinion should have controlling weight.

In making a RFC determination, the ALJ is required "to minimally articulate his reason for accepting or rejecting evidence." *Elder,* 529 F.3d at 415. The ALJ gives controlling weight to the opinions of a treating physician if the opinion is well-supported and consistent with the record. SSR 96-2p. An ALJ must give "good reasons" for discounting the treating physician's opinion. *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). When the ALJ does not give the treating physician controlling weight in the decision, the ALJ must consider the length, nature, and extent of the treatment relationship, frequency of the examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion. 20 C.F.R. § 416.927(c)(2).

In her argument, Caudill does not offer evidence to support her claim that the ALJ impermissibly considered Dr. Cadwell a consulting physician rather than a treating physician. A treating source is an acceptable medical source that has provided medical treatment or evaluation to the claimant and who has, or has had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 416.902. An ongoing treatment relationship exists when the claimant saw the medical source frequently enough to be consistent with accepted medical practices for the treatment of the medical condition. *Bridges v. Astrue,* 2012 WL 3204889, at *8 (N.D. Ind. August 1, 2012). The record indicates that Zachary met with Dr. Cadwell twice at the advice of his therapist, Ms. Uceny. (Tr. 251). Two visits with a doctor do not establish the ongoing relationship necessary for the doctor to qualify as a treating source. Yet Caudill does not explain why she believes Dr. Cadwell was a treating physician. She only makes a bald assertion that Dr. Cadwell is.

17

Moreover, Dr. Cadwell herself identified her two visits with Zachary as a "psychological consultation." (Tr. 251). Caudill has not demonstrated that the heightened standard presuming controlling weight for treating physicians applies to Dr. Cadwell. The ALJ is only required to minimally articulate his reasons for accepting or rejecting evidence. *Elder,* 529 F.3d at 415. Consequently, the ALJ's conclusion that Dr. Cadwell's consultation was supported by the record sufficiently explained his decision to afford Dr. Cadwell's opinion substantial weight.

Furthermore, Caudill does not provide evidence of the significance of the difference between Dr. Cadwell's finding that Zachary needed a "supported environment," and Dr. Kladder's finding that Zachary had moderate limitations in social functioning and concentration. Here, the ALJ did not provide testimony of the state agency doctor that contradicts Dr. Cadwell's opinion. The ALJ articulated Dr. Kladder's opinion that Zachary failed to exhibit significant deficits in social, daily, personal or cognitive functions, but that Zachary had difficulties with concentration, persistence, and pace. (Tr. 28). Similarly, Dr. Cadwell determined that Zachary was "anything but intellectually delayed." (Tr. 254). In her opinion, Zachary was not in an impaired range in intellectual functioning across verbal and non-verbal visuospatial, working memory, attention skills, and visual processing speed. *Id*. Furthermore, Dr. Cadwell found that Zachary was "capable of independent living with good support" and was also "capable of supported employment." *Id*. As such, the ALJ created the logical bridge needed to explain the weight given to the opinions of Dr. Cadwell and Dr. Kladder. Therefore, substantial evidence supports the ALJ's RFC determination.

### 4. The ALJ's determination that Zachary can perform other jobs in the national economy

Under Medical Vocational Rule 201.27, a sedentary work RFC could justify a finding of "not disabled." 20 C.F.R. § 404 app. 2. If one of the findings of fact about the vocational factors

18

and RFC are not the same as the corresponding criterion rule, the ALJ consults a vocational expert ("VE"). 20 C.F.R. § 416.966(e). Here, the ALJ found that Zachary retained the RFC to perform sedentary work, but only if he was limited to lifting and carrying ten pounds; sitting, standing and walking for six hours in an eight hour work day; occasionally balancing, stooping, kneeling, crouching and crawling. In addition, the ALJ found that Zachary must avoid concentrated exposure to extreme heat, cold, and humidity; could only have occasional interactions with co-workers, supervisors, and the public; and could keep pace and meet quotas and complete tasks typical to unskilled work. (Tr. 25). Because of these additional limitations to Zachary's RFC, the ALJ consulted the VE to determine whether jobs existed for an individual with Zachary's age, education, work experience, and RFC. 20 C.F.R. § 416.966(e).

Caudill argues that the ALJ's determination that jobs existed in the national economy for Zachary was not supported by substantial evidence because the ALJ asked the VE to make a determination based on the incorrect fact that Zachary had graduated from high school. The Commissioner acknowledges that the ALJ misspoke in the opinion when he said that Zachary had a high school education. Nonetheless, the Commissioner argues that even if the ALJ had properly noted that Zachary did not graduate from high school, it would not have changed his overall determination that Zachary was not disabled.

When an ALJ cannot determine at step five if jobs exist in the national economy with medical considerations alone, the ALJ consults the Medical Vocational Guideline grid. 20 C.F.R. Pt. 404 Subpt. P §§ 200.00. These guidelines consider various vocational factors such as age, education, and work experience in combination with the individual RFC to determine whether an individual is able to engage in substantial gainful activity. *Id.* According to the grid, a person with marginal education or a high school education, without work experience, and with

19

Zachary's RFC would not be considered disabled.  *See* 20 C.F.R. Pt. 404 Subpt. P §§ 201.23, 201.24.  In fact, even a young individual between 18 and 44, like Zachary; who is illiterate or unable to communicate in English, unlike Zachary; and who has no past relevant work, is not disabled. *Id.*  However, the Medical Vocational Guidelines cannot be determinative on their own in this case because Zachary suffered from additional limitations. 20 C.F.R. § 404 app. 2.  Yet at the hearing, the ALJ did not state that the additional limitations had anything to do with Zachary's education.  (Tr. 62-63).  Furthermore, Caudill does not claim that they do.  Therefore, even if the ALJ were to correctly state that Zachary did not graduate from high school, it would not change the disability determination based on the Medical Vocational Guidelines.  Because the Court is confident that the ALJ would reach the same result upon remand, the Court refuses to remand based on the ALJ's misstatement regarding Zachary's education level.  *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011).

## III.  CONCLUSION

For the reasons stated above, Caudill's motion to reverse or remand is **DENIED**. [Doc. No. 13].  This Court **AFFIRMS** the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g).

**SO ORDERED**

Dated this 23rd day of January, 2014.

                                          S/Christopher A. Nuechterlein
                                          Christopher A. Nuechterlein
                                          United States Magistrate Judge